FILED

2010 NOV 19 P 3: 42

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
N.D. CA. SAN JOSE

**FARUQI & FARUQI, LLP**
VAHN ALEXANDER (167373)
1901 Avenue of the Stars, Second Floor
Los Angeles, CA 90067
Telephone: (310) 461-1426
Facsimile: (310) 461-1427
Email: valexander@faruqilaw.com

*Attorneys for Plaintiff*

**E-filing**

**ADR**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| ELEANOR TURBERG, Derivatively on Behalf of Nominal Defendant VIVUS, INC., <br><br> Plaintiff, <br><br> v. <br><br> MARK B. LOGAN, LELAND F. WILSON, LINDA M. DAIRIKI SHORTLIFFE, M.D., PETER Y. TAM, and CHARLES J. CASAMENTO, <br><br> Defendants, <br><br> -and- <br><br> VIVUS, INC., a Delaware corporation, <br><br> Nominal Defendant. | Case No. **CV 10- 05271** HRL <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

1    Plaintiff Eleanor Turberg ("Plaintiff"), by her attorneys, alleges for her Verified Shareholder
2   Derivative Complaint against defendants upon personal knowledge as to herself and her own acts,
3   and as to all other matters upon information and belief based upon, *inter alia*, the investigation made
4   by and through her attorneys, as follows

5                                    **SUMMARY OF THE ACTION**

6        1.    This is a shareholder's derivative action brought on behalf of nominal defendant
7   Vivus, Inc. ("Vivus" or the "Company") by one of its shareholders against certain of the Company's
8   officers and members of its Board of Directors (the "Board") alleging that these officers and
9   directors breached their duties to the Company between September 9, 2009, and the present (the
10  "Relevant Period") by willfully and/or recklessly failing to monitor the Company's internal controls
11  over financial reporting, thereby causing or allowing the Company to violate the federal securities
12  laws by issuing material misrepresentations to the investing public concerning Vivus' operations and
13  performance during the Relevant Period.

14       2.    Defendants' wrongful conduct has significantly and materially damaged the
15  Company.   By virtue of defendants' breaches of fiduciary duty, the Company faces a lawsuit
16  alleging violations of the federal securities laws and has suffered irreparable damage to its reputation
17  and goodwill.

18       3.    Vivus is a biopharmaceutical company that develops therapies to address obesity,
19  sleep apnea, diabetes, and male sexual health.   The Company develops and commercializes
20  therapeutic products for large underserved markets and currently has one FDA-approved drug on the
21  market, MUSE®, a prescription treatment for erectile dysfunction.  The Company also has several
22  investigational product candidates in late stages of clinical development that are focused on market
23  opportunities in obesity and related morbidities, including sleep apnea and diabetes, and sexual
24  health where the potential worldwide pharmaceutical market could approach billions.   The
25  Company's lead product in clinical development is Qnexa® ("Qnexa" or the "drug"), an
26  experimental drug that has completed Phase III clinical trials for the treatment of obesity.  In
27  December 2009, Vivus submitted a New Drug Application ("NDA") to the Food and Drug

28

1   Administration ("FDA") to have Qnexa approved as an obesity drug. On March 1, 2010, the FDA
2   accepted the NDA filing for review.

3       4.      During the Relevant Period, defendants caused or allowed Vivus to issue materially
4   false and misleading statements to the investing public regarding Qnexa by allowing the Company to
5   continuously hype Qnexa's "remarkable safety," and its potential for success via NDA approval,
6   while materially understating the health risks associated with the drug. As a result of these false
7   statements, the defendants caused the Company's stock to trade at artificially inflated prices during
8   the Relevant Period, reaching a high of $13.68 per share on May 18, 2010.

9       5.      On July 15, 2010, the Endocrinologic and Metabolic Drugs Advisory Committee of
10  the FDA (the "FDA Panel") composed of independent medical experts whose recommendations
11  carry great weight within the FDA approval process, voted 10 to 6 against the approval of Qnexa
12  based upon an "overall risk-benefit assessment" for use in obese individuals and certain overweight
13  patients with other health problems such as diabetes or high blood pressure.[1] Even some of the panel
14  members who voted "yes" noted that it was "a very fine line between a yes and a no vote," and that
15  they could have voted no.

16      6.      The FDA Panel members who voted "no" cited "serious" and "life-threatening" side
17  effects in Qnexa's trial data, including birth defects, depression, anxiety, sleep disorders, cognitive
18  disorders, metabolic acidosis (too much acid in the body fluids), and an unknown impact on the heart
19  as reasons they could not recommend the drug's approval.

20      7.      The FDA Panel refused to recommend Qnexa as a chronic or "lifetime" drug therapy
21  because the limited data made it "difficult if not impossible" to weigh the long-term safety of the
22  drug. Only 56 weeks of safety data were provided from the clinical studies even though, if
23  approved, the expected time frame for Qnexa use would be much longer since obesity is a "chronic
24  disease requiring chronic treatment." According to Dr. Lamont G. Weide, a voting panel member

25

26  [1] The sixteen voting FDA Panel members included: Dr. Thomas P. Bersot, Dr. David M. Capuzzi, Dr. Allison
    B. Goldfine, Dr. Abraham Thomas, Dr. Lamont G. Weide, Dr. Elaine H. Morrato, Dr. Sanjay Kaul, Dr.
27  Kenneth D. Burman, Dr. Susan R. Heckbert, Dr. Katherine M. Flegal, Dr. Jessica W. Henderson, Dr. Janet D.
    Cragan, Ms. Melanie Coffin, Dr. Ed J. Hendricks, Dr. Michael A. Proschan, and Dr. Michael A. Rogawski.
28

1  and endocrinologist at the University of Missouri, Kansas City, "[t]he real question is when we look
2  at this drug is how safe it is and for how long because this is likely a lifetime therapy." Dr. Weide
3  also specifically stated, "I feel uncomfortable with a year's worth of data." Other FDA Panel
4  members indicated that chronic use would likely require longer-term studies of approximately five
5  years.

6       8.     Vivus investors were not aware of Qnexa's "serious" and "life-threatening" health
7  risks, or the inadequacy of the clinical data, prior to the FDA Panel's July 15, 2010 vote. When
8  news of the vote was publicly announced on July 15, 2010, the market price of Vivus common stock
9  plummeted, falling $6.70 per share, or 55%, in one day on unusually high trading volume of over
10  42.3 million shares.

11       9.     The true facts, which defendants knew or should have known during the Relevant
12  Period, but concealed from the investing public with repeated and express assurances of the drug's
13  safety profile, were as follows:

14       (a)     the studies conducted by Vivus and submitted to the FDA Panel could not
15  support FDA Panel approval for Qnexa's use to treat obesity as a chronic condition, and, at the very
16  least, longer-term clinical studies would be needed to determine whether Qnexa was safe for its
17  intended use to treat chronic obesity;

18       (b)     the trial results showed worrisome adverse effects of the type that scuttled
19  approval for other obesity drugs, including: increased risk of suicide, cardiovascular events, and
20  birth defects;

21       (c)     four to seven times as many patients taking the highest dose of Qnexa,
22  compared to patients taking lower doses or placebos, dropped out of the study because of adverse
23  side effects such as anxiety, sleep disorders, or depression; and

24       (d)     Qnexa would likely receive a "Pregnancy Category X" label from the FDA
25  due to birth defects (teratogenicity) risk, instead of the proposed "Pregnancy Category C" label,
26  thereby potentially eliminating a huge swath of potential Qnexa customers.

27

28

1      10.    Instead of revealing the serious risks revealed by the study data, defendants caused or

2 allowed the Company to repeatedly tout Qnexa's safety profile. As a result of the false and

3 misleading statements, Vivus's stock traded at artificially inflated prices during the Relevant Period.

4 Such inflated stock prices permitted one of the defendants to sell shares of his Company stock at

5 inflated prices for proceeds of more than $2.8 million.

6      11.    On October 28, 2010, the FDA officially denied Vivus's NDA for Qnexa, as

7 recommended by the FDA Panel on July 15, 2010. In the FDA's Complete Response Letter that set

8 forth the reasons Qnexa was rejected, the FDA asked Vivus to provide a thorough evaluation of the

9 drug's potential for causing birth defects and heart problems. Specifically, the FDA requested that

10 Vivus provide a detailed plan and strategy to evaluate and mitigate the potential teratogenic (birth

11 defects) risks in women of childbearing potential taking the drug for the treatment of obesity; and to

12 provide evidence that the elevation in heart rate associated with phentermine/topiramate does not

13 increase the risk for major adverse cardiovascular events. Additionally, the FDA requested that

14 Vivus formally submit the results from the SEQUEL study (which Vivus announced was completed

15 on September 21, 2010), a 52-week extension study for a subset of 675 patients who completed the

16 previously reported 56-week CONQUER study. Finally, the FDA reserved the right to comment

17 further on proposed labeling.

18      12.    As a result of the misconduct described herein, current members of Vivus' Board are

19 antagonistic to this lawsuit such that making a demand on the Board. Each of the Individual

20 Defendants (as defined herein) faces a substantial likelihood of non-exculpated liability for their

21 breaches of fiduciary duty disabling the current Board members from impartially considering the

22 subject matter of this lawsuit.

23                                 **JURISDICTION AND VENUE**

24      13.    This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C.

25 §1332(a)(2) because complete diversity exists between Plaintiff and each defendant, and the amount

26 in controversy exceeds $75,000. This is not a collusive action designed to confer jurisdiction on a

27 court of the United States that it would not otherwise have.

28

<div align="center">

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

5

</div>

14. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contact with California so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

15. Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Vivus occurred in this District and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that have an effect in this District.

## PARTIES

16. Plaintiff is, and at all relevant times was, a shareholder of nominal defendant Vivus. Plaintiff is a citizen of New York.

17. Nominal Defendant Vivus was founded and incorporated in California on April 16, 1991, and completed a re-incorporation in the state of Delaware in May 1996. The Company's headquarters are located at 1172 Castro Street, Mountain View, CA 94040. Vivus is a citizen of both California and Delaware.

18. Defendant Mark B. Logan ("Logan") has been a Director of Vivus since March 1999 and Chairman of the Board since April 2007. From 1994 to 2001, Logan was chairman of the Board, President and Chief Executive Officer of Visex Incorporated, a medical device company. From January 1992 to October 1994, he was Chairman of the Board and Chief Executive Officer of Insmed Pharmaceuticals, Inc., a pharmaceutical company. Previously, Logan held several senior management positions at Baush & Lomb, Inc., a medical products company, including senior vice president, healthcare and consumer group, and also served as member of its Board of Directors. Logan also served as a Director of Abgenix, Inc., a biopharmaceutical company, until its acquisition

1   by Amgen Inc. Logan received a B.A. from Hiram College and a P.M.D. from Harvard Business
2   School. Upon information and belief, Logan is a citizen of Virgina.

3          19.    Defendant Leland F. Wilson ("Wilson") has been a Director of Vivus since the
4   Company was formed in April 1991 and Chief Executive Officer since November 1991. Prior to
5   joining Vivus, Wilson was Vice President of Marketing and Corporate Development of Genelabs
6   Technologies, Inc. from 1989 to 1991. Wilson was Group Product Director, later promoted to
7   Director of Marketing, at LifeScan, a Johnson & Johnson company, from 1986 to 1989. From 1973
8   to 1986, Wilson served in several research, marketing and sales positions for Syntex Research and
9   Syntex Laboratories, Inc. Wilson received a B.S. and an M.S. from Pennsylvania State University
10  and was a Lieutenant in the United States Army. Upon information and belief, Wilson is a citizen of
11  California.

12         20.    Defendant Linda M. Dairiki Shortliffe, M.D. ("Shortliffe") has been a Director of
13  Vivus since June 1999. Shortliffe has been professor of urology at Stanford University School of
14  Medicine since 1993 and Chair of the Department of Urology since 1995. She has also been Chief
15  of Pediatric Urology of Lucile Salter Packard Children's Hospital at Stanford since 1991. She is a
16  fellow of the American College of Surgeons and the American Academy of Pediatrics. Shortliffe
17  has also served as a member of the special grants chartered review committee for the National
18  Institute of Diabetes, Digestive, and Kidney Diseases of the National Institutes of Health and several
19  other national committees. She has authored numerous publications and her works appear in
20  prominent medical journals and books. Shortliffe received an A.B. from Radcliffe/Harvard College
21  and an M.D. from Stanford University. Upon information and belief, Shortliffe is a citizen of
22  California.

23         21.    Defendant Peter Y. Tam ("Tam") has been a Director of Vivus since October 2009
24  and its President since November 2009. Tam has held various senior management positions at
25  Vivus, including serving as Chief Operating Officer of the Company from July 2004 to January 2009
26  and as Senior Vice President of Product and Corporate Development and Vice President of Strategic
27  Planning and Corporate Development. Tam joined Vivus in 1993 as Manager of Clinical Research,

28

1  and in 1999 he assumed the responsibilities of Director of Clinical and Corporate Development.
2  Prior to Vivus, Tam held various research and clinical development positions at Genentech from
3  1991 through 1993 and XOMA Corporation from 1987 to 1991. Tam received a B.S. in Chemistry
4  from University of California Berkeley in 1986 and his M.B.A. at Santa Clara University in 2000.
5  Upon information and belief, Tam is a citizen of California.

6      22.    Defendant Charles J. Casamento ("Casamento") has been a Director of Vivus since
7  April 2008. Casamento is Executive Director and principal of the Sage Group, a health care
8  advisory group specializing in business development transactions. Prior to the Sage Group, he was
9  President and CEO of Osteologix, Questcor and Interneuron. Casamento has held a number of
10 marketing, sales, finance and business development positions with Sandoz, Hoffmann-LaRoche,
11 Johnson & Johnson, American Hospital Supply Corporation and Genzyme. Casamento is a Director
12 and member of the Board of Directors at Cortex Pharmaceuticals and SuperGen. A graduate of
13 Fordham University in New York City and Iona College in New Rochelle, New York, Casamento
14 has a degree in Pharmacy and an MBA. Upon information and belief, Casamento is a citizen of
15 California.

16     23.    The defendants identified in ¶¶ 18 through 22 are referred to herein as the "Individual
17 Defendants."

18                    **DUTIES OF THE INDIVIDUAL DEFENDANTS**

19     24.    By reason of their positions as officers, directors and/or fiduciaries of Vivus and
20 because of their ability to control the business and corporate affairs of Vivus, the Individual
21 Defendants owed Vivus and its shareholders fiduciary obligations of trust, loyalty, good faith and
22 due care, and were and are required to use their utmost ability to control and manage Vivus in a fair,
23 just, honest and equitable manner. The Individual Defendants were and are required to act in
24 furtherance of the best interests of Vivus and its shareholders so as to benefit all shareholders equally
25 and not in furtherance of their personal interest or benefit.

26     25.    Each director and officer of the Company owes to Vivus and its shareholders the
27 fiduciary duty to exercise good faith and diligence in the administration of the affairs of the

28

1  Company and in the use and preservation of its property and assets, and the highest obligations of
2  fair dealing.

3      26.     The Individual Defendants, because of their positions of control and authority as
4  directors and/or officers of Vivus, were able to and did, directly and/or indirectly, exercise control
5  over the wrongful acts complained of herein. Because of their advisory, executive, managerial and
6  directorial positions with Vivus, each of the Individual Defendants had access to adverse non public
7  information about the financial condition, operations, and improper practices of Vivus.

8      27.     At all times relevant hereto, each of the Individual Defendants was the agent of each
9  of the other Individual Defendants and of Vivus, and was at all times acting within the course and
10 scope of such agency.

11     28.     To discharge their duties, the officers and directors of Vivus were required to exercise
12 reasonable and prudent supervision over the management, policies, practices and controls of the
13 affairs of the Company. By virtue of such duties, the officers and directors of Vivus were required
14 to, among other things:

15         (a)   refrain from acting upon material inside corporate information to benefit
16 themselves;

17         (b)   ensure that the Company complied with its legal obligations and requirements,
18 including acting only within the scope of its legal authority and disseminating truthful and accurate
19 statements;

20         (c)   conduct the affairs of the Company in an efficient, business like manner so as
21 to make it possible to provide the highest quality performance of its business, to avoid wasting the
22 Company's assets, and to maximize the value of the Company's stock;

23         (d)   remain informed as to how Vivus conducted its operations, and, upon receipt
24 of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry
25 in connection therewith, and to take steps to correct such conditions or practices and make such
26 disclosures as necessary to comply with applicable laws; and

27
28
                        **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**
                                          9

1        (e)    ensure that the Company was operated in a diligent, honest and prudent

2 manner in compliance with all applicable laws, rules and regulations.

3        29.    Each Individual Defendant, by virtue of his position as a director and/or officer, owed

4 to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of

5 due care and diligence in the management and administration of the affairs of the Company, as well

6 as in the use and preservation of its property and assets. The conduct of the Individual Defendants

7 complained of herein involves a knowing and culpable violation of their obligations as directors

8 and/or officers of Vivus, the absence of good faith on their part, and a reckless disregard for their

9 duties to the Company and its shareholders that the Individual Defendants were aware or should

10 have been aware posed a risk of serious injury to the Company. The conduct of the Individual

11 Defendants who were also officers and/or directors of the Company during the Relevant Period have

12 been ratified by the remaining Individual Defendants who collectively comprised all of Vivus's

13 Board during the Relevant Period.

14       30.    The Individual Defendants breached their duties of loyalty and good faith by allowing

15 defendants to cause, or by themselves causing, the Company to misrepresent its financial results, and

16 prospects as detailed herein, by failing to properly oversee the Company's business and operations,

17 and by failing to prevent the Individual Defendants from taking such illegal actions.

18       **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

19       31.    The Individual Defendants engaged in a conspiracy, common enterprise and/or

20 common course of conduct commencing by at least September 9, 2009, and continuing thereafter.

21 During this time, the Individual Defendants caused the Company to conceal the true facts as alleged

22 herein.

23       32.    The purpose and effect of the conspiracy, common enterprise, and/or common course

24 of conduct was, among other things, to disguise the Individual Defendants' violations of law,

25 breaches of fiduciary, and unjust enrichment, to conceal adverse information concerning the

26 Company's operations, financial condition and future business prospects, and to artificially inflate

27 the price of Vivus common stock so the Individual Defendants could protect and enhance their

28

1  executive and directorial positions and the substantial compensation and prestige they obtained as a
2  result thereof.

3       33.    The Individual Defendants accomplished their conspiracy, common enterprise and/or
4  common course of conduct by causing the Company to purposefully, recklessly or negligently fail to
5  maintain effective accounting and internal control policies and procedures.  Because the actions
6  described herein occurred under the authority of the Board, each of the Individual Defendants was a
7  direct, necessary and substantial participant in the conspiracy, common enterprise and/or common
8  course of conduct complained of herein.

9       34.    Each of the Individual Defendants aided and abetted and rendered substantial
10 assistance in the wrongs complained of herein.  In taking such actions to substantially assist the
11 commission of the wrongdoing complained of herein, each of the Individual Defendants acted with
12 knowledge of the primary wrongdoing, substantially assisted the accomplishment of that
13 wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

14      35.    At all times relevant hereto, each of the Individual Defendants was the agent of each
15 of the other Individual Defendants and of Vivus, and was at all times acting within the course and
16 scope of such agency.

17                          **SUBSTANTIVE ALLEGATIONS**

18 **Background**

19      36.    With the rise of obesity in the U.S., many drug manufacturers are racing to obtain
20 approval for their appetite suppressing weight loss drugs, so that these drugs can be marketed to the
21 masses for long-term use.  A weight loss drug that wins regulatory approval could bring in billions
22 of dollars a year.  However, weight loss drugs that have reached the market or gotten to the final
23 stage of FDA vetting have repeatedly been hampered by side effects and safety issues.  Such is the
24 case with Vivus's proposed obesity drug treatment, Qnexa, which completed the pivotal Phase 3
25 clinical trial program, including the EQUATE, EQUIP, and CONQUER studies.

26      37.    Qnexa is an appetite suppressant that is a blend of two separate, already existing,
27 medications: phentermine (also known under the brand names Adipex-P, Atti Plex P, Fastin, etc.),

28

1   and topiramate (also known under the brand names Topamax, and Topiragen). Phentermine is FDA-

2   approved and has been used for many years as a successful short-term weight loss formula,

3   notwithstanding the drug's association with the infamous Fen-Phen weight-loss drug that was shown

4   to cause potentially fatal pulmonary hypertension and heart valve problems, and eventually led to the

5   drug's withdrawal and legal damages of over $13 billion for drug manufacturer Wyeth. Topiramate

6   has also been approved by the FDA. It has been used for years as an anticonvulsant to treat epilepsy

7   and has also been used to treat migraine headaches or as an antidepressant, but also has a history of

8   negative side effects.   Qnexa essentially combines these two pre-existing drugs into a single

9   experimental drug for targeted long-term weight loss. Ever since the Fen-Phen fiasco mentioned

10  above, anti-obesity drugs reviewed by the FDA have faced strong scrutiny. Most anti-obesity drugs

11  have failed to obtain FDA-approval for the same safety issues highlighted by the FDA Panel in

12  voting against recommending Qnexa, as described below:

13      •       In 2008, Merck & Co. and Pfizer Inc. stopped testing two obesity drugs under

14              development after Sanofi-Aventis SA abandoned efforts to get FDA approval for its

15              obesity pill Acomplia, which was linked to depression.

16      •       In early October 2010, the FDA pressured drug manufacturer Abbott Laboratories to

17              take its diet drug Meridia off the market after a study found that the drug raised the

18              risks of heart attacks and strokes in certain patients. Meridia was approved three

19              years ago in 1997 even though an advisory committee had rejected it.

20      •       On October 22, 2010, the FDA rejected another diet drug, Arena Pharmaceuticals's

21              Lorcaserin because a study showed that the drug in high doses caused tumor

22              formation in rats. The rejection came after an advisory committee to the FDA had

23              voted 9 to 5 against approval in September 2010.

24      38.     In recent years, in light of increased political sensitivity with respect to drug safety,

25  the FDA has been raising the bar for new drug approvals, driven (at least in part) by complaints that

26  the agency did not adequately consider safety data and by calls from Congress to stiffen standards.

27  The painkiller Vioxx was voluntarily withdrawn in 2004 after safety concerns surfaced, and more

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

12

1    recently the diabetes drug Avandia, which is still on the market, has been the focus of congressional

2    inquiries and mass tort lawsuits by users of Avandia alleging harm from use of the drug. Both drugs,

3    with multibillion-dollar sales at their peak, were linked to serious heart problems.

4        39.    These past events, in which serious side effects were discovered relating to obesity

5    drugs, have created a cautious environment that will require solid safety results before FDA approval

6    is granted to new drugs, including Qnexa.

7    <u>The Individual Defendants Cause or Allow the Company to Make False or Misleading
8    Statements</u>

9        40.    On September 9, 2009, the Individual Defendants caused or allowed Vivus to

10   announce "outstanding" results from two Phase 3 studies it had conducted. On this date, Vivus

11   issued a press release announcing that: (a) obese patients on Qnexa achieved average weight loss of

12   up to 14.7% and significant improvements in co-morbidities; (b) results of EQUIP and CONQUER

13   Phase 3 Studies exceeded FDA benchmarks for obesity treatments; and (c) demonstrated a positive

14   safety profile. The Company's press release provided further detail regarding Qnexa's efficacy and

15   positive safety profile, stating in relevant part that there is "no signal for suicidality risk," increased

16   depression, or clinically significant change in overall cognitive function or effect on psychomotor

17   skills.

18       41.    The Company's September 9, 2009, press release stated as follows:

19       MOUNTAIN VIEW, Calif., Sept 09, 2009 /PRNewswire-FirstCall via COMTEX
         News Network/ -- VIVUS, Inc. (Nasdaq: VVUS) today announced positive results
20       from two final, phase 3 pivotal 56-week studies, EQUIP (OB-302) and CONQUER
         (OB-303), evaluating the safety and efficacy of Qnexa(TM), an investigational drug,
21       in more than 3,750 patients across 93 sites. The EQUIP and CONQUER studies met
         all primary endpoints by demonstrating statistically significant weight loss with all
22       three doses of Qnexa, as compared to placebo. Patients taking Qnexa also achieved
         significant improvements in cardiovascular and metabolic risk factors including blood
23       pressure, lipid levels, and type 2 diabetes.

24                                *       *       *

25       Qnexa is a proprietary formulation and unique dosing regimen that combines two
         well known pharmaceutical therapies - phentermine and topiramate - to create a
26       novel, patented therapy. The phase 3 program evaluated three doses of Qnexa
         (numbers reflect milligrams of phentermine and controlled release topiramate,
27       respectively):

28
─────────────────────────────────────────────────────
                    VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

                                    13

1      --    Qnexa 15/92 (full dose)

2      --    Qnexa 7.5/46 (mid dose)

3      --    Qnexa 3.75/23 (low dose)

4                           *      *      *

Across both 56-week studies comprised of more than 3,750 patients, the most commonly reported side effects were dry mouth, tingling, constipation, altered taste and insomnia. *Monthly assessments using prospective psychometric instruments in accordance with FDA's guidance showed no signal for suicidality risk. There were no suicide attempts or suicidal behaviors, and there was no signal for suicidal ideation across all treatment groups including placebo.* Depression or depressed mood adverse events of a moderate to severe nature were less than 2% and were similar among patients in the Qnexa and placebo groups. Overall, depression scores, quality of life including self esteem and general health significantly improved for patients on Qnexa.

VIVUS completed a thorough QT prolongation (TQT) study evaluating subjects taking Qnexa. The study was completed with no signal for QT prolongation. Subjects taking Qnexa also underwent complex and extensive cognitive and psychomotor testing using validated, FDA accepted testing methodologies. *There was no clinically significant change in overall cognitive function or effect on psychomotor skills seen in patients taking Qnexa.*[2]

42.     The September 9, 2009, Vivus press release also reported that EQUIP study patients taking full-doses of Qnexa had a higher completion rate than those taking either the placebo or the low-dose of Qnexa, and CONQUER study patients taking the high-dose of Qnexa had a higher completion rate than those taking the placebo. The September 9, 2009, Vivus press release stated, in relevant part:

Completion rate for EQUIP was 47%, 57%, 59% for patients taking placebo, low-dose Qnexa and full-dose Qnexa, respectively.

                           *      *      *

Completion rates for CONQUER were 57%, 69%, 64% for patients taking placebo, mid-dose Qnexa, and full-dose Qnexa, respectively.

43.     Defendant Wilson was quoted in this press release regarding Qnexa's prospects as follows:

The results of the phase 3 program, designed and executed after Special Protocol Assessments were completed by the FDA, exceed the FDA benchmarks for clinically significant weight loss. *The results support the company's plan to file a New Drug Application with the FDA by the end of 2009 and submit the results from the*

---

[2] At all times, emphasis is added unless otherwise indicated.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

*studies for publication in peer-reviewed journals. We believe these results may provide a compelling opportunity for global pharmaceutical companies, and we intend to initiate partnering discussions now that we have the full data set in hand.*

44. Vivus also hosted an investors' conference call on September 9, 2009, to trumpet Qnexa's safety data. During the conference call Vivus CEO, defendant Wilson, described Qnexa's safety profile as follows:

Qnexa was well tolerated and demonstrated an excellent benefit risk profile. *Based on the efficacy and safety data that you will see we believe Qnexa meets all FDA requirements for approval.*

\*       \*       \*

. . . [t]here was no difference in total serious adverse events between placebo and active treatment. And there was no difference in drug-related serious adverse events. *Yeah, the drug related adverse events that we saw were few and there was no pattern of any one particular item.* I would say that one of the issues that the – that does come up with these kinds of drugs and weight loss drugs in general is that *we have I think two kidney stones and one gallstone as serious adverse events in the clinical study. But that's the only one that we think is drug-related in the serious adverse event column.*

\*       \*       \*

I think again all of you would agree that this – the studies have produced remarkable – not only remarkable efficacy, *but remarkable safety* as well. *And we've looked at this from every different perspective, at every different issue as far as safety is concerned and we have found literally no issues of concern at this point. And so I want to emphasis that very, very strongly* . . . [t]his is a very exciting time for our company and it should be a very exciting time for our investors as well.

45. Defendant Wilson stated the following regarding dosage tolerance levels for trial patients:

Based on what we see from the data, clearly the low-dose will be used as apart of a titration regimen which will take patients up to the middle-dose. *And then the middle-dose I think will be adequate for a majority of the patients for a significant period of time and that will allow a – the higher dose then will allow a doctor to move up if the patient is doing well and is well tolerated* but it gives them that choice to go to higher level of medicine and to – and I think the doctor can tailor this to the heavier patients that have more co-morbidities that they want to lose weight faster, those kinds of an approach. But it gives a wonderful opportunity here for a doctor to titrate into the tolerance with the individual patient.

46. Wesley W. Day, Ph.D. ("Day"), Vivus's Vice President in charge of clinical development, elaborated on Qnexa's glowing safety profile and low discontinuation rate, stating, in relevant part:

Now let's turn our attention to safety. Slide 28 presents a detailed table, which lists treatment emergent side effects from both studies, across all treatments arms, that were reported at a frequency greater than 5%. *Importantly, there were no surprises*

1   *to this list. The most commonly reported side effects were dry mouth, tingling sensation, constipation, upper respiratory infection, and altered taste. The majority of the events were mild.*

2   The combined EQUIP and CONQUER discontinuation rate is presented in slide 29.
3   Clear measures of drug tolerability are study completion rate and discontinuation rate
    due to side effects. On slide 29, we observed an overall higher study completion rate
4   along with a *low study discontinuation rate due to AEs [adverse effects]*. Also listed
    on the slide are the reasons for study discontinuation due to AEs that occurred in
5   greater than 1% of patients. *Importantly, no distinct pattern or reason for dropout is
    seen, as no event occurred in more than approximately 2% of patients.* As shown
6   on the slide, discontinuation for depression associated with Qnexa, at 1.4%, was low,
7   especially considering that 26 to 30% of patients had background of psychiatric
    disorders.

8   Since depression and suicidality are a point of emphasis with the FDA, we perform
    prospective, comprehensive assessments and in-depth review of all safety data
9   associated with these points. On slide 30, the incidence of moderate and severe
    depression, depressed mood, was similar across all three doses compared to placebo,
10  with reports ranging from 1.2% to 1.9%, as compared to 1.7% on placebo. *There
    were no serious adverse events reported for depression or depressed mood.*

11  Slide 30 presents our depression analysis involving the PHQ-9 tool. As part of our
    prospective analysis of depression, we evaluated the risk of depression using the
12  Physicians' Health Questionnaire, PHQ-9, for each patient at every visit. ThePHQ-9
    is a validated psychometric instrument accepted by the FDA for assessing the
13  presence and severity of depression. Over 38,000 assessments were administered
    throughout the phase 3 program. *This extensive assessment supports the conclusion
14  that there is no signal for depression. In fact, as compared to baseline, there was
    significant improvement in depression assessments as measured by improvement in
15  the PHQ-9 scores for Qnexa.*

16  As shown in slide 32, suicidality was assessed using the Columbia Suicide Severity
    Rating Scale or CSSRS. This is a tool developed by Columbia University and
17  accepted by the FDA. Assessments were made at each visit, with over 38,000
    assessments taken in EQUIP and CONQUER. *The results of the extensive
18  assessments were: no suicides, no suicide attempts, no suicidal behavior; no signal
    for suicidal ideation. Based on these results, there is no signal for suicidal risk.*

19  Overall safety assessments is presented in slide 33. We evaluated serious adverse
    events across both EQUIP and CONQUER, and found that *there were no differences
20  in either total serious adverse events or drug-related serious adverse events between
    Qnexa and placebo.* There was one death that occurred in the placebo group.

21  In addition to the safety assessments included in EQUIP and CONQUER studies,
    several assessments and additional studies have been performed. *Cognitive function
22  testing: no clinically relevant effects seen. Psychomotor testing: studies are
    completed and no clinically relevant effects have been observed.* In addition, we
23  completed a thorough QT study, and in this study there was no signal for QT
    prolongation. Finally, *we have completed several drug interactions and special
24  population studies; these studies are complete, and there were no findings of
    concern.*

25

26  47.   Separately, on September 9, 2009, defendant Wilson was interviewed on the financial

27  news television network CNBC regarding Qnexa's prospects and safety profile. During this public

28

1   appearance, Wilson described Qnexa's safety profile as "remarkable" and proclaimed the drug's

2   "superior safety."

3       48.    Vivus shares reacted positively to the announced results for Qnexa. In reaction to this

4   announcement, the price of Vivus's stock dramatically jumped by $4.89 per share, or 70%, in just

5   one day. On that very same day, September 9, 2009, defendant Wilson sold 200,000 shares for

6   proceeds of $2,245,000.

7       49.    Over the course of the next several months, Vivus presented at many Wall Street

8   sponsored healthcare conferences at which the Individual Defendants caused or allowed Vivus

9   management to describe the "overwhelmingly positive" results of Qnexa's Phase 3 studies.

10       50.    On September 10, 2009, defendant Wilson described Qnexa's positive safety profile

11   at Rodman & Renshaw's Global Investment Conference as an "extremely safe" product for the

12   obesity market, stating, in relevant part:

13   Let's turn our attention to safety, obviously a big concern here that we wanted to look
   and ***demonstrate a product that was extremely safe for the obesity market, and I***

14   ***think that's what you're going to see that we have come up with...***[t]here is nothing
   in here of concern that we haven't seen in other trials or is not in the label of existing

15   studies. The most frequent adverse events are dry mouth, tingling and constipation.
   These are patients losing weight, not drinking enough water and they have these most

16   frequent adverse events, but nothing of concern. Most of these adverse events are not
   related to drug as well as you'll see in a comparison of placebo to active. Okay. This

17   – let's take a look at the serious adverse events that we had in the trial. Total serious
   adverse events were the same between Qnexa and when we assess the total safety set

18   for EQUIP and CONQUER between Qnexa and placebo. The drug-related SAE's
   [serious adverse effects] were not different between Qnexa and placebo as well and

19   clearly at a very low level. There was one death in the study and it occurred on
   placebo. In addition to the assessments that we did with EQUIP and CONQUER, we

20   have completed a number of other studies important to this therapeutic area. We
   completed a cognitive function, examination and studies with no clinically relevant

21   effects. We did psychomotor testing with no clinically relevant effects. We did
   thorough QT analysis and no signal for QT prolongation. We did drug interaction

22   studies, no findings of concern and we looked at special populations such as patients
   with liver and kidney disease and found no findings of concern.

23

24                        \*     \*     \*

25   The drug was well tolerated with completion rates significantly higher than placebo
   and a compelling risk benefit profile supporting approval, reimbursement and

26   commercial success of this product.

27                        \*     \*     \*

28   ***[n]o serious adverse events occurred in this study*** . . . the drug-related series adverse
   events were 0.4% for both active and placebo.

<center>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</center>

51.     On September 11, 2009, the Individual Defendants caused or allowed Day to describe

the strong safety profile and continuation rate of Phase 3 study patients taking Qnexa at the Thomas

Weisel Partners Healthcare Conference, noting "no signal of any increase in depression," and "no

cardiovascular signal to speak of," stating in relevant part:

> Some of the interesting attributes of Qnexa we think that make it certainly unique and
> provide the safety and efficacy profile that you see have to do with the dosage.
>
> *       *       *
>
> One of the important and positive outcomes of the trial was the completion rate. For
> obesity trials that are notoriously difficult to retain subjects in, we saw a significant
> completion rate which was greater than placebo on our two Qnexa arms, 57 and 59%
> specifically, compared to a 47 completion rate on our placebo treated subjects.
>
> *       *       *
>
> So now just to kind of summarize some of the important safety endpoints from these
> two trials. This fairly detailed slide that I'm presenting here presents both studies, all
> 2,500 or so subjects on CONQUER and about 1,250 on EQUIP by treatment arm for
> all adverse events with a incidence of 5% or greater. So these are the adverse events
> that were more commonly experienced. Overall, the vast majority of these events
> were mild in nature and didn't affect retention in the study. But the important thing
> with our adverse event profile in this study is there were no surprises. We saw
> adverse events that were fairly consistent with what we've seen in the past, we didn't
> see anything new, and certainly we didn't see a severity, change or difference from
> other studies that would have raised a concern. All of these effects were generally
> mild as I mentioned before. The most common events dry mouth, tingling,
> constipation, altered taste. These are the types of events that we've seen in the past
> and have been the most frequent type of events that we've seen before.
>
> *So this wasn't obviously our only safety assessment. We've done quite a few safety
> assessments. Importantly on serious adverse events, we saw very low overall
> incidents of SAEs in a treatment-emergent or non-causality based assessment, we
> see a very similar level of SAEs 3.3% both in Qnexa arms as well as placebo. And
> then when we look at it on a relatedness perspective, all drug related SAE there was
> no difference between placebo and Qnexa.*
>
> We've also preformed extensive assessments of cognitive. Those are complete with
> no real signals of any concern there. Psychomotor testing, we performed a standalone
> study and that study was completed, no clinically relevant effects. We performed a
> thorough QT study. That study is complete with no QT prolongation. And finally, to
> kind of round-off the whole NDA package, we've performed several drug interactions
> and special populations, and again **no findings of concern**.
>
> *       *       *
>
> Depression has been a huge area of interest for us. In all of our studies, we included
> psychometric tools to assess depression PHQ-9, well recognized, well validated tool
> for assessing depression recommended by the FDA. This was administered to every
> subject at every visit, about 38,000 times in each trial. And what I can tell you is that
> *there was no signal of any increase in depression*. Moreover, we saw a significant
> improvement in PHQ-9 scores overall.
>
> *       *       *

The drop-out due to AEs across the board, all treatment arms was low and it was low compared to other similarly designed and executed studies in the Phase 3 setting. What we did see was a 9% discontinuation rate due to AEs for placebo. We saw a slightly lower than that for the low dose of Qnexa and we saw 18% discontinuation for the full-dose of Qnexa. So we did see a slightly higher discontinuation on the full-dose Qnexa despite the fact that the overall completion rate on Qnexa was higher than placebo. So what this suggests is that although a few subjects dropped out on — due to adverse events, the vast majority of subjects did complete and the overall discontinuation rate due to adverse events was relatively low. And there were no single events that appeared to be driving the discontinuation rate. The highest frequency of any event was under 2% for discontinuation rate. So there is no real consistent story on what would explain it, just kind of a broad thing.

<div align="center">*    *    *</div>

Some of the reasons for dropout were insomnia, for example. This is a pretty common occurrence. It's associated with phentermine. And again, I think it was about 1.5%, accounted for 1.5%. But again there is a whole list of reasons and nothing emerges.

<div align="center">*    *    *</div>

We did have a few dropout for constipation. Fortunately, constipation, tingling and dry mouth which are reasons for discontinuation, all three of these are well managed with adequate hydration. In the frequency or the rate of weight loss that many of these patients experienced on Qnexa often they become dehydrated and this exacerbates some of the symptoms. So many of the more successful investigators were really good at advising and counseling the patients to keep Themselves adequately hydrated.

<div align="center">*    *    *</div>

Heart rate, there was real — there was no signal there of any clinical relevance. The difference between mid and low dose versus placebo were 0 to 0, no increase at all. The full-dose had one millimeter, I mean, one beat per minute increase in heart rate. Now the reason what we're learning on the heart rate effect is, we saw a significant drop in blood pressure and a one beat per minute on average increase in the presence of the significant change in systolic and diastolic kind of the line . . . ran extensive cardiovascular assessments. We ran a standalone QT study which all of that was assessed. And *there is no cardiovascular signal to speak of.* And in the presence of a blood pressure drop that we're seeing with this treatment, one beat per minute increase which has *no statistical or clinical significance isn't something that is of concern or of issue.* In our previous Phase III study we actually saw a reduction in heart rate. So it's not even a consistent effect.

52.    On March 8, 2010, Vivus hosted a conference call to announce Q4 2009 earnings results. The Individual Defendants once again caused or allowed the Company to brush aside safety concerns regarding Qnexa's safety profile when questioned by analyst Mike King of Merriman:

<Q - Mike King>: *[g]iven the sort of political sensitivity and very focused — FDA is very focused on safety issues, why should investors have confidence that Qnexa will gain approval on a first cycle review?*

<A - Leland F. Wilson, Chief Executive Officer>: *The first thing I would say is that we are very confident that Qnexa will be approved on the PDUFA data.* And as you know we have had two products approved on the PDUFA data here at VIVUS and have some credibility I think in speaking to that matter. Now specifically concerning

<div align="center">VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</div>

1   the product, with the FDA it's all about risk benefit profile. And as you know obesity
    is now known as one of the most devastating diseases we have in this country, cost
2   associated with or in excess of $150 billion a year. And to our knowledge we have
    the state-of-the-art therapy for the treatment of obesity. I think clearly everyone
3   recognizes the efficacy of Qnexa.    Now speaking specifically at the safety
    considerations here, as you know, Mike, we have expended considerable effort and
4   time trying to meet all of the possible targeted medical event issues that could come
    up. Things such as the neurologic and psychological aspects of it was our test with
5   PHQ-9, C-CASA suicidality and all those things. We have completed them all under
    an SPA using the latest tools possible *and we are extremely confident of the*
6   *outcome,* and I think we've been very forthcoming in disclosing all the data that we
    have on a top line basis for the safety consideration. *So, the view that we have is this*
7   *drug is remarkably safe,* clearly there are three doses that has allowed the physician
    to titrate to a specific patient based upon their tolerance for the drug and clearly even
8   the mid dose had results that achieved greater weight loss than to my knowledge any
    previous therapy that has been submitted to the FDA...[S]o Peter [Tam], if you have a
9   comment?

10  <A - Peter Y. Tam, President>: [w]hat we are using is, again is a combination of low
    doses of two already approved drugs which I certainly feel very comfortable with
11  given the millions of years of patient experience on these two drugs. So, we are very,
    very confident that the FDA would be able to reach a decision hopefully quickly. We
12  are working with the division right now to answer the questions and we believe that
    the FDA is really reviewing this in a very expedited – not an expedited review, but
    they are currently doing their job and we are really glad to see that.

13  <A - Leland F. Wilson, Chief Executive Officer>: Yeah, I would just comment
    further on what Peter said. *I think a lot of people failed to understand that this*
14  *submission is done under a 505(b)(2) submission, which relies in part on the goes a*
    *long ways towards making people comfortable with the safety profile of the drug.*
15  *As Peter mentioned, there is more than five million patient years of history with*
    *these drugs on the market, both are very large selling drugs in the marketplace.*
16  *And I would also comment that there is not one event in our clinical program that*
    *is not in the label for both – for either phentermine or topiramate in the*
17  *marketplace. So, there were no surprises in our entire clinical program.* I think the
    only surprises were the dramatic weight loss and because of the reduction in doses
18  that we used over the market products, a reduction in the side-effect profile.

19      53.     Defendant Wilson then spoke about Qnexa's cardiovascular issues and whether the

20  FDA will require a further "outcome study" of Qnexa's cardiovascular effects prior to approval.

21  Defendants Wilson and Tam fielded questions from analyst Jason Butler of JMP Securities:

22      <Q - Jason Butler>: Hi, thanks for taking the question. I had a question relating to
        the cardiovascular risk. . . . in the run up to the Qnexa NDA submission and in the
23      short time since, has the FDA's communications with you over the requirements to
        assess cardiovascular risk changed in any way?

24      <A - Leland F. Wilson, Chief Executive Officer>: No, and in fact we have written
        communications with the FDA concerning the need for an outcome study. No need –
25      *there is not a need for an outcome study for the treatment of obesity. And so that's*
        *been reaffirmed on several occasions in writing from the FDA to us. So we're*
26      *comfortable with that.* Now that doesn't mean the FDA can't change their mind at
        any point. The second one that I think is important to consideration [sic] here too, I
27      don't know of a drug that has ever demonstrated an improvement in all
        cardiovascular and metabolic endpoints that we have seen with Qnexa in these trials.
28

────────────────────────────────────

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

20

So it speaks highly towards the potential cardiovascular benefits that we've seen – that can be seen with this drug, and I'll ask Peter to comment if he has any other comments on this.

<A - Peter Y. Tam, President>: *So there is nothing here that we believe would trigger an FDA's change of mind in requiring a cardiovascular safety study.*

54. Defendant Wilson later reiterated his confidence in Qnexa and underscored the importance of the upcoming FDA review process to Vivus's business prospects:

Again, 2009 was pretty remarkable, but we're looking at 2010 as being potentially even more remarkable, clearly to have a positive panel for Qnexa and to have the approval on the PDUFA date would certainly trump having successful Phase III data that we had last year. So we're looking for a great 2010, someone likened it, or somebody asked me one time, are you nervous or scared? And I said, no I'm probably overconfident, but I'm anxious, *This is our Super Bowl, our Olympics, et cetera and we're well prepared.* We want to go to the advisory panel, we want to defend our product. *And we believe that the data is – justifies approval on the PDUFA date, and feel strongly about that. So we're ready to go.* And we're going to even be more ready by the time it happens, which will likely have an advisory panel in September, is my opinion, and we'll be ready to go. *So very confident.* And so, appreciate everybody's support, and *it's going to be a great year.*

55. On May 3, 2010, Vivus hosted a conference call to announce Q1 2010 earnings results. The Individual Defendants caused or allowed defendant Wilson once again to tout Qnexa's "outstanding" cardiovascular-related data, stating:

[W]e feel very strongly, as you know, that the cardiovascular benefits of this drug are really outstanding. And so *we're anxious to present our cardiovascular data. It is outstanding."*

56. During the May 3, 2010, conference call, defendant Wilson made the following statements regarding Qnexa's psychiatric adverse effects:

We have presented all the data that we have on our psychiatric AEs to this point. I mean, clearly, we have probably the most thorough and complete look at – of both depression and suicidality of any product that's ever been through the FDA through the Phase 3 program. *And clearly, we really have a zero indication of any suicidality.* When you look at the PHQ-9 test scores, we actually have a slight improvement on treatment. If you look at quality of life, we have an improvement of every major – of every domain that is tested. Now the one area that we have focused on is the dropout rate for patients on depression, and as we have previously presented to you that the dropout rate is higher on the high dose, but that dropout rate, the depression that was there, was primarily mild and manageable and resolved in the majority of cases while still on the drug and still on the study. So we think we have a very thorough and very convincing review of the psychiatric adverse events and we're really very confident that we're in very good shape here. Remember now, as I always like to say, when you talk about the psychiatric adverse events, you're talking about topiramate in general. And so the doses that we use are very low compared to the approved doses of topiramate and the experience in the marketplace now. And then we have the counterbalancing activity, the complementary pharmacology of phentermine, which is really I think helps to ameliorate some of those side effects.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

21

1 And so we have just done an A to Z look at this and really in my view there is really nothing here to report."

2 57. The above statements were materially false and misleading because, contrary to the

3 repeated and express trumpeting of Qnexa's safety profile:

4 (a) the studies conducted by Vivus and submitted to the FDA Panel could not

5 support FDA Panel approval for Qnexa's use to treat obesity as a chronic condition, and longer-term

6 clinical studies would be needed to determine whether Qnexa was safe for its intended use to treat

7 chronic obesity;

8 (b) Qnexa showed potential significant and worrisome adverse effects of the type

9 that scuttled approval for other obesity drugs, including: increased risk of suicide, cardiovascular

10 events, and birth defects;

11 (c) four to seven times as many patients taking the highest dose of Qnexa,

12 compared to patients taking lower doses or placebos, dropped out of the study because of adverse

13 side effects such as anxiety, sleep disorders, or depression;

14 (d) Qnexa would likely receive a "Pregnancy Category X" label from the FDA

15 due to birth defects (teratogenicity) risk, instead of the proposed "Pregnancy Category C" label,

16 thereby potentially eliminating a huge swath of potential Qnexa customers.

17 58. As a result of the Individual Defendants' reckless failure to monitor the Company's

18 internal controls over financial reporting regarding Vivus' business and future prospects, Vivus's

19 stock traded at artificially inflated prices during the Relevant Period. Such inflated stock prices

20 permitted top Vivus officers/directors to sell shares of their Company stock at inflated prices for

21 proceeds of over $2.8 million. However, after the above adverse news hit the marketplace, the

22 Company's shares were hammered by massive sales, sending them down 60% from their Relevant

23 Period high.

24 **The Truth Begins to Emerge**

25 59. On July 15, 2010, the FDA Panel held a hearing to review Qnexa. The FDA Panel

26 acknowledged that Qnexa resulted in "significant" weight loss, but voted against recommending

27 Qnexa based on concerns over potential safety issues relating to serious adverse effects; such as the

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

22

1  unknown cardiovascular impact, or negative psychological effects, such as depression and suicide;
2  debated usage by pregnant women due to the potential for birth defects; and the unknown impact of
3  long-term use beyond the 56-week clinical study period. The FDA Panel voted 10-to-6 in the
4  negative on the question of whether the "overall risk-benefit assessment of Qnexa is favorable to
5  support approval." The FDA usually follows its panel recommendations, although it is not required
6  to do so.

7      60.     The ten FDA Panel committee members voting against approval included: Dr. Bersot,
8  Dr. Burman, Dr. Cragan, Dr. Flegal, Dr. Heckbert, Dr. Morrato, Dr. Proschan, Dr. Thomas, Dr.
9  Weide, and Dr. Capuzzi.

10      61.     Dr. Morrato explained her rationale for voting against recommending Qnexa for FDA
11  approval as follows:

> My concerns were the public health consequences, given the long list of safety risks
> that were listed for the drug, and the strong pent-up market demand for effective
> weight loss pharmacotherapy. That is, the drug will be used by 5 millions of patients
> over long periods of time, far exceeding the label indications for use and duration of
> clinical experience that we have...[i]t's chronic disease requiring chronic treatment.
> And while it's always challenging when individual patients have personal success
> stories, I had to ask myself, to balance against the initiating a huge public health
> experiment...[s]o I erred on no.
>
> *I agree also with the maternal health team's recommendations. If it is to be
> approved, it would be a category X, and that there be attention made to really think
> through the development and pretesting of the medication.*

18      62.     Dr. Proschan explained his rationale for voting against recommending Qnexa for
19  FDA approval as follows:

> I voted no . . . [P]art of my reasons was that *a lot of these potential problems are sort
> of brain-related, depression, anxiety, memory, cognitive.* And that always makes me
> worry a little more than with other kinds of problems, although I think there were
> other problems that certainly were brought up that *I don't think we have enough data
> to really be able to say whether they are serious issues or not...when you only do a
> one-year trial, to me I'm not willing to make that leap that in another year, there
> might not be problems that revealed that these are very serious and they don't go
> away.*

24      63.     Dr. Burman explained his rationale for voting against recommending Qnexa for FDA
25  approval as follows:

> I voted no . . . the medication has *serious potential adverse effects, including
> potential teratogenicity, increased suicidal ideation, cognitive issues, decreased
> bicarb, tachycardia, and possible renal stones. Some of these side effects are
> serious and could be life-threatening, and they have to be weighed against the*

*potential of a relatively modest weight loss and its long-term health benefits. It is difficult if not impossible to weigh these issues since the clinical studies are only for about a year and these medications, if approved, will be used for a much longer time frame in a much wider population.*

The question remains open in my mind whether it is worthwhile to approve a medication for moderate weight loss when it has significant potential issues.

64.     As Dr. Burman highlighted, potential teratogenicity and pregnancy category labeling was also extensively discussed by the FDA Panel. The pregnancy category of a pharmaceutical agent is an assessment of the risk of fetal injury due to the pharmaceutical, if it is used as directed by the mother during pregnancy. Vivus requested a birth-defects designation of "pregnancy category C," which denotes "animal reproduction studies have shown an adverse effect on the fetus and there are no adequate and well-controlled studies in humans, but potential benefits may warrant use of the drug in pregnant women despite potential risks." However, according to documents submitted to the panel for review (the "FDA Memo") the Company's proposed labeling for Qnexa included pregnancy warnings and precautions that are typically associated with a pregnancy category D or X drug. Category D or X labeling indicates either: "there is positive evidence of human fetal risk based on adverse reaction data from investigational or marketing experience or studies in humans, but potential benefits may warrant use of the drug in pregnant women despite potential risks," or "studies in animals or humans have demonstrated fetal abnormalities and/or there is positive evidence of human fetal risk based on adverse reaction data from investigational or marketing experience, and the risks involved in use of the drug in pregnant women clearly outweigh potential benefits," respectively. The FDA Memo reportedly noted that Vivus's proposed labeling could be confusing to physicians and patients of child-bearing age, and that such confusion was a serious concern because of the "large potential" for women to become pregnant while taking the drug, thereby triggering the birth defect concerns. The FDA Memo recommended that Qnexa be labeled as "pregnancy category X," the strongest label possible, indicating that the risk of using Qnexa during pregnancy "clearly outweighs any possible benefit," and also recommended that Vivus's labeling include risk evaluation and mitigation strategies (REMS) for patients in case of accidental pregnancy by Qnexa users.

1    65.    Dr. Flegal explained her rationale for voting against recommending Qnexa for FDA

2    approval as follows:

3           I also voted no . . . I think my views -- I think it was both colored, maybe, by our
            experience with Avandia and the safety concerns that we should deal with them
4           before rather than afterwards...*[t]his is like a public health experiment, a large
            gamble.* And I think widespread usage even in inappropriate populations is difficult
5           to prevent. *We have one-year information, but this drug will likely be used for a
            long time.* It really addresses surrogate endpoints, and there's minimal information
6           on subgroups, even, like sex and ethnic groups. I think we need more data. . . [A]nd I
            think that the risk management is a very difficult challenge, and that we need more
7           information and research on how to really monitor this, how to control access.

8           66.    Dr. Thomas explained his rationale for voting against recommending Qnexa for FDA

9    approval as follows:

10          I voted no. And just to preface, before I moved to Henry Ford, for six years I was the
            medical director of a weight management program at the Brigham, taking care of
11          thousands of patients with obesity . . . *[T]he concerns we have are with safety.* And
            as previously mentioned, we want to make sure we don't avoid a situation where, five
12          years from now, we're back from an advisory meeting considering safety issues. So
            there's a few things that I think have to be addressed, and I think it's best that these
13          are addressed before approval, or at least started before approval so that they can be
            finished soon after the medication is released.

14          The first is cardiovascular disease . . . I think we should start a cardiovascular trial to
            look at outcomes in a higher risk population before release so we have the data within
15          two to three years of release of the medication.

16          The second thing is I'm very concerned about bone health . . . [T]his medication,
            because of the acidosis, could affect both spectrums of bone health, peak bone mass
17          in the younger generation -- because peak bone mass is developed through the mid-
            20s -- and then osteoporosis or fracture risk in the older subjects. I think this data
18          could be accumulated as part of some of these studies that are done for safety because
            they'll have large numbers to tell, and hopefully we'll also have fracture data from
19          the sponsor at a later point.

20          The third thing is the sponsor used a restricted fat diet, not a low carbohydrate diet.
            Most patients, when they're going to use this, will pick a diet of their own, in spite of
21          what we tell them. So we do need to have some real world data of what happens
            when people are on a low fat diet versus a high fat diet...[S]o I think some data on
22          that would be important to know what happens with acidosis.

23          We do need more information about suicide risk. It took 10- or 12,000 patients for
            rimonabant to have that signal to be really clear. The meta-analysis also needed a lot
24          of patients with topiramate. So I think as the course of data is being obtained for
            these other outcomes, like cardiovascular disease, that data can also be obtained in
            terms of depression and suicidal ideation.

25          Then finally, *I think we have to get away from the concept of usage for a short
            term. Obesity is a chronic disease.* Blood pressure is a chronic disease. I would
26          never go to someone who has high blood pressure and say, your blood pressure is
            normal; now we stop all your medications; see you in a year. But with obesity, we
27          view it that way. *So we have to look at the long-term safety of these medications so
            we can prevent weight regain.*

28

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

67. Dr. Bersot explained his rationale for voting against recommending Qnexa for FDA approval as follows:

> I'm the second of the doubting Thomases . . . [W]e need more evidence in the high risk cardiovascular disease patient.

68. Dr. Weide explained his rationale for voting against recommending Qnexa for FDA approval as follows:

> I voted no . . . you have to say, tell me what's going to happen with my patients as I allow them to stay on the medication [indefinitely]. And that's one of the things that bothers me. If, with a year's trial, you have double the depression risk and you have some cardiovascular questions, I would like to see it extended. I would like to see the at-risk population be sicker, if you will, so that we can find out whether or not these safety concerns are going to be a major issue. I would agree, *I am really sick of taking medicines off of the market after they've been on a year or two because we've identified something that we didn't know about.* And that really is some of what has given the FDA a reputation outside in the public.
>
>           \*        \*        \*
>
> We do have a responsibility to protect the public at large, and that means, although as much as I feel for the people who want this drug and want to lose weight, we have to protect the population at large. *And I think we just need longer term data with the people who are really going to be using it out there rather than a select group of patients in fairly good health.*

69. Dr. Cragan explained her rationale for voting against recommending Qnexa for FDA approval as follows:

> I voted no . . . in the end, *I couldn't really justify widespread use with the reproductive outcomes concerns that we have.* And as I listened to the panel members discuss the other adverse events, it actually raised my level of concern rather than lessening it.

70. Dr. Susan R. Heckbert explained her rationale for voting against recommending Qnexa for FDA approval as follows:

> I voted no . . . obesity is very difficult to combat, the medications that are used to treat it are often very strong medications with a variety of different effects. We've talked here about how these two medications interfere with a number of different biological pathways . . . *we have a number of signals of adverse effects that really can't be ignored that need more exploration. And the ones I'm most concerned about are the suicidality risk, the potential for cardiovascular risk based on the mechanism of action of these drugs and the heart rate signal, and of course the teratogenicity.* [It won't] be possible to fully answer that teratogenicity question with clinical trials. But I think we do need more information about it as well as the other serious endpoints that I mentioned.

---

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

71.     Panel members indicated that chronic use would require longer-term studies of approximately five years would be necessary to satisfy their safety concerns relating to chronic use. Dr. Proschan, a mathematical statistician for the National Institutes of Health, noted that if there was a "longer follow-up" he would have voted yes and gave the following example to prove his point that one year of data was inadequate to approve Qnexa for chronic use:

> I don't feel comfortable with one year follow-up. In clinical trials, people often say, well, how do you know that it won't cause cancer in 15 years? The answer is, we don't know. We do five-year trials. We don't know whether it might cause cancer in 15. But when you do a one-year trial, to me, I'm not willing to make that leap in another year, there might not be problems that revealed that these are very serious and they won't go away.

72.     Dr. Flegal, Senior Research Scientist of the National Center for Health Statistics of the Centers for Disease Control and Prevention, voiced similar concerns, suggesting that five years of data would give a better indication of the safety effects of Qnexa.

73.     In a statement made on July 15, 2010, Defendant Wilson stated that the Company was disappointed by the FDA Panel's decision but said Vivus would work with the FDA in advance of the October 28, 2010, deadline to rule on Qnexa's NDA.

74.     In reaction to Vivus's July 15, 2010, disclosure, the price of Vivus's common stock plummeted, from a closing price of $12.11 per share on July 15, 2010, to a closing price of $5.41 per share on July 16, 2010, a one-day drop of 55% on unusually heavy trading volume of over 42 million shares.

### DAMAGES TO THE COMPANY

75.     As a result of the Individual Defendants' misconduct, Vivus failed to maintain proper internal controls over financial reporting which caused or allowed the Company to conceal adverse information concerning the Company's operations, financial condition and future business prospects.

76.     The Company now faces a lawsuit alleging violations of the federal securities laws.

77.     Further, as a direct and proximate result of the Individual Defendants' actions, Vivus has expended and will continue to expend significant sums of money that it otherwise would not have spent. Such expenditures include, but are not limited to:

1          a.   costs incurred in investigating and defending Vivus and certain officers and

2  directors in the securities class action, plus potentially millions of dollars in settlements or to satisfy

3  an adverse judgment; and

4          b.   costs incurred from compensation and benefits paid to certain of the

5  Individual Defendants, which compensation was based at least in part on Vivus' artificially inflated

6  stock price.

7                                    **ILLEGAL INSIDER SELLING**

8      78.     While in possession of undisclosed material adverse information, defendant Wilson

9  sold the following shares of Vivus stock:

10

11

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
|  |  |  |  |  |
| Leland F. Wilson | 05/18/10 | 50,000 | $ 13.00 | $ 650,000 |
|  | 09/09/09 | 50,000 | $ 12.00 | $ 600,000 |
|  | 09/09/09 | 50,000 | $ 11.00 | $ 550,000 |
|  | 09/09/09 | 100,000 | $ 10.95 | $ 1,095,000 |
| **Total** |  | **250,000** |  | **$ 2,895,000** |

18

19                                     **DEMAND IS FUTILE**

20      79.     Plaintiff incorporates by reference and realleges each and every allegation stated

21  above as if fully set forth herein. Presently, the Board consists of the following five individuals:

22  defendants Logan, Wilson, Shortliffe, Tam and Cassamento. Plaintiff did not make a demand on the

23  Board to bring this action because such demand would be futile given the facts as alleged herein and,

24  therefore, such a demand is excused.

25      80.     As specified herein, demand is excused because this Verified Shareholder Derivative

26  Complaint alleges with particularity that a majority of the members of the current Board breached

27  their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

28

                            VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  Indeed, during the Relevant Period the Individual Defendants caused the Company to fail to
2  maintain proper internal controls over financial reporting and, therefore, to issue false and
3  misleading statements regarding the Company's business, operations and prospects relating to
4  Qnexa. The Individual Defendants' misconduct has severely damaged the Company and now a
5  lawsuit alleging violations of the federal securities laws has been filed against the Company.
6  Further, Vivus' reputation and goodwill have been tainted by the misconduct described herein.

7       81.    During the Relevant Period, the Audit Committee consisted of defendants Logan
8  (Chair), Casamento and Shortliffe. The Audit Committee held five meetings during fiscal year
9  2009. The Charter for the Audit Committee charges its members with overseeing the accounting,
10 financial reporting and audit processes and reviewing the Company's internal controls over financial
11 reporting. Thus, defendants Logan, Casamento and Shortliffe were expressly responsible for
12 ensuring the adequacy of procedures in place to oversee financial reporting. In carrying out such
13 duties, the Audit Committee was responsible for "reviewing on a continuing basis the adequacy of
14 the Company's system of internal controls, including meeting periodically with the Company's
15 management and the independent auditors to review the adequacy of such controls." The Audit
16 Committee was also responsible for "[r]eviewing (before release) the unaudited quarterly operating
17 results in the Company's quarterly earnings release" and "[r]eviewing, in conjunction with counsel,
18 any legal matters that could have a significant impact on the Company's financial statements."
19 Despite their duties and responsibilities, the members of the Audit Committee failed to ensure that
20 the Board had adequate corporate governance policies in place to prevent the wrongdoing alleged
21 herein. As such, defendants Logan, Casamento and Shortliffe face a substantial threat of liability
22 and cannot fairly consider a demand to commence litigation.

23      82.    Generally, the Board "as a whole is responsible for overseeing [the Company's] risk
24 management function" In carrying out such responsibility, the Board and senior management must
25 "routinely discuss and analyze any significant strategic, operational, financial, legal and compliance
26 risks facing the Company as well as [] general risk management strategy and actions taken by senior
27 management in compliance with this strategy." According to the Company's Proxy Statement filed

28

<div align="center">VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</div>

1 April 30, 2010, the "Audit Committee assists the Board of Directors in fulfilling its oversight
2 responsibilities with respect to risk management in the areas of financial reporting, internal controls
3 and compliance with legal and reglulatory requirements." In addition, by its Code of Ethics, the
4 entire Board is required to "[p]romote full, fair, accurate, timely and understandable disclosure in
5 reports and documents that the Company files with, or submits to the U.S. Securities and Exchange
6 Commission and in other public communications made by the Company." Similarly, the Code of
7 Ethics requires that the Board "[a]ct in good faith, responsibly with due care and diligence and
8 without misrepresentation or omission of material facts and strive to maintain independent judgment
9 in the performance and fulfillment of their duties and responsibilities. The Code of Ethics also
10 directs the Board to "[p]romote ethical behavior among subordinates and peers at the Company," to
11 "[r]espect the confidentiality of information acquired or obtained in the course of performance of
12 their responsibilities, [and] never use confidential information for personal advantage" and to
13 comply with all "policies and procedures of the company applicable to their positions and
14 employment, including the Company's Insider Trading Policy."

15     83.    During 2009, the Board held seven meetings and each director attended at least 70%
16 of the meetings. Despite their duties and responsibilities, the members of the Board failed to ensure
17 that the Company had adequate polices in place to prevent the wrongdoing alleged herein.

18     84.    The Individual Defendants' conduct described herein and summarized above could
19 not have been the product of legitimate business judgment as it was based on intentional, reckless
20 and disloyal misconduct. Thus, none of the Individual Defendants, who constitute a majority of the
21 current Board of the Company, can claim exculpation from their violations of duty pursuant to the
22 Company's charter (to the extent such a provision exists). As a majority of the Individual
23 Defendants face a substantial likelihood of liability, they are self-interested in the transactions
24 challenged herein and cannot be presumed to be capable of exercising independent and disinterested
25 judgment about whether to pursue this action on behalf of the shareholders of the Company.
26 Accordingly, demand is excused as being futile.

27

28

85. Read together with the facts summarized above and alleged with particularity herein, pre-suit demand is also excused as futile for the following reasons:

(a) The principal professional occupation of defendant Wilson is his employment with Vivus as Chief Executive Officer of the Company, in which role he received and continues to receive substantial monetary compensation and other benefits. Specifically, during fiscal years 2007, 2008 and 2009, Wilson earned $2,147,122, $1,716,077 and $2,080,097, respectively, in salary, options and other compensation. In its Proxy Statement filed April 30, 2010, the Company concedes that Wilson is not independent.

(b) The principal professional occupation of defendant Tam is his employment with Vivus as President of the Company, in which role he received and continues to receive substantial monetary compensation and other benefits. Specifically, during fiscal years 2007, 2008 and 2009, Tam earned $688,095, $941,818 and $2,199,041, respectively, in salary, options and other compensation. It its Proxy Statement filed April 30, 2010, the Company concedes that Tam is not independent.

## FIRST CAUSE OF ACTION

### (Breach of Fiduciary Duty Against the Individual Defendants)

86. Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

87. Each of the Individual Defendants owed the Company and its shareholders the highest duties of loyalty, good faith, honesty, and care in conducting their affairs and the business of the Company.

88. Under the current circumstances, the Individual Defendants also had a duty to:

(a) act in the interests of the Company and all of its equity owners; and

(b) act in accordance with the fundamental duties of loyalty, care and good faith.

89. Because of their respective positions with the Company, the Individual Defendants also are required to:

1          (c)    act independently to ensure that the best interest of the corporation and its

2 shareholders take precedence over any interest possessed by a director, officer, or controlling

3 shareholder; and

4          (d)    ensure that if there are conflicts of interest between the Individual Defendants'

5 interests and their fiduciary obligations of loyalty, that they are resolved in the best interest of the

6 Company and its public shareholders

7     90.    In causing or allowing the Company to fail to maintain adequate controls over

8 financial reporting, and to engage in unlawful labor practices, the Individual Defendants have not

9 taken any steps to protect the interests of the Company and, in fact, have breached their fiduciary

10 duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

11     91.    Each of the Individual Defendants had actual or constructive knowledge that they had

12 caused the Company to engage in improper practices. These actions could not have been a good

13 faith exercise of prudent business judgment to protect and promote the Company's corporate

14 interests.

15     92.    As a direct and proximate result of the Individual Defendants' failure to perform their

16 fiduciary obligations, Vivus has sustained significant damages.

17     93.    Accordingly, Plaintiff, as a shareholder of the Company, seeks monetary damages,

18 injunctive remedies, and other forms of equitable relief on Vivus's behalf.

19     94.    Plaintiff and the Company have no adequate remedy at law.

20                    **SECOND CAUSE OF ACTION**

21          **(Against Defendant Wilson for Misappropriation of Information)**

22     95.    At the time of the stock sales set forth herein, defendant Wilson knew the information

23 described above and sold Vivus stock on the basis of such information.

24     96.    The information described above was proprietary non-public information concerning

25 the Company's financial condition and future business prospects. It was a proprietary asset

26 belonging to the Company, which defendant Wilson used for his own benefit when he sold Vivus

27 common stock.

28

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1      97.    At the time of his stock sales, defendant Wilson knew the Company's true prospects.

2 Wilson's sales of Vivus common stock while in possession of this material adverse non-public

3 information was a breach of his fiduciary duties of loyalty and good faith.

4      98.    Since the use of the Company's proprietary information for his own gain constitutes a

5 breach of defendant Wilson's fiduciary duties, the Company is entitled to the imposition of a

6 constructive trust on any profits defendant Wilson obtained thereby.

7 <div align="center">**PRAYER FOR RELIEF**</div>

8     WHEREFORE, Plaintiff demands judgment as follows:

9     A.    Authorizing the maintenance of this action as a derivative action, with Plaintiff as the

10 derivative Lead Plaintiff;

11     B.    Declaring that the Individual Defendants have violated their fiduciary duties to the

12 Company;

13     C.    Awarding compensatory damages against defendants individually and severally in an

14 amount to be determined at trial, together with pre-judgment and post-judgment interest at the

15 maximum rate allowable by law;

16     D.    Directing Vivus to take all necessary actions to reform and improve their corporate

17 governance and internal procedures to comply with applicable laws and to protect Vivus and its

18 shareholders from a repeat of the damaging events that occurred during the Relevant Period,

19 including, but not limited to, putting forward for shareholder vote resolutions for amendments to the

20 Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary

21 to place before shareholders for a vote the following Corporate Governance Policies:

22     (i)    a proposal to strengthen the Boards' supervision of operations and develop

23 and implement procedures for greater shareholder input into the policies and guidelines of the Board;

24     (ii)    a provision to permit shareholders of Vivus to nominate at least three

25 candidates for election to the Board; and

26     (iii)    appropriately test and then strengthen the internal compliance and control

27 functions; and

28

<div align="center">VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</div>

<div align="center">33</div>

1    E.    Awarding Plaintiff the costs and disbursements of this action, including reasonable

2  allowances for Plaintiff's attorneys' and experts' fees and expenses; and

3    F.    Granting such other or further relief as may be just and proper under the

4  circumstances.

5                              **JURY DEMAND**

6        Plaintiff demands a trial by jury.

7  Dated: November 19, 2010              **FARUQI & FARUQI, LLP**

8                                        By: _____
                                            Valin Alexander (167373)
9

10                                       1901 Avenue of the Stars, 2nd Floor
                                         Los Angeles, CA 90067
11                                       Telephone: (310) 461-1426
                                         Facsimile: (310) 461-1427
12                                       Email: valexander@faruqilaw.com

13                                              -and-

14                                       Nadeem Faruqi , Esq.
                                         Beth A. Keller, Esq.
15                                       369 Lexington Avenue, 10th Floor
16                                       New York, NY 10017
                                         Telephone: (212) 983-9330
17                                       Facsimile: (212) 983-9331
                                         Email: nfaruqi@faruqilaw.com
18                                              bkeller@faruqilaw.com

19

20

21

22

23

24

25

26

27

28
      _____
              **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

                              34

**VERIFICATION**

I, Eleanor Turberg, am a plaintiff in the within action and a resident of the State of New York. I have read the foregoing Verified Shareholder Derivative Complaint and know the contents thereof, except as to the matters stated therein to be alleged on information and belief, and as to those matters, I believe them to be true.

November 11, 2010

_Eleanor Turberg_
ELEANOR TURBERG